UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AMANDA YARRINGTON,

                          Plaintiff,


          v.                                        3:18-CV-1250
                                                    (FJS/ML)

CANDOR CENTRAL SCHOOL DISTRICT;
JEFFREY J. KISLOSKI, *individually and in
his Official Capacity as Superintendent of Schools
for the Candor Central School District*; BERN
SMITH, *individually and in his Official Capacity
as Director of Operations for the Candor Central
School District*; DAREN JENSEN, *individually
and in his Official Capacity as Transportation
Supervisor for the Candor Central School
District*; and GREG NICHOLS, *individually and
in his Official Capacity as Mechanic for the Candor
Central School District*,

                          Defendants.
_____

APPEARANCES                              OF COUNSEL

LAW OFFICES OF RONALD R. BENJAMIN        RONALD R. BENJAMIN, ESQ.
126 Riverside Drive
P.O. Box 607
Binghamton, New York 13902
Attorneys for Plaintiff

THE LAW FIRM OF FRANK W. MILLER          CHARLES C. SPAGNOLI, ESQ.
499 S. Warren St. Suite 3050             FRANK W. MILLER, ESQ.
Syracuse, New York 13057                 GIANCARLO FACCIPONTE, ESQ.
Attorneys for Defendants


SCULLIN, Senior Judge

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Amanda Yarrington ("Plaintiff"), a bus driver for the Candor Central School District ("Defendant District"), brought this action based on gender discrimination against Defendant District, its Superintendent ("Defendant Kisloski"), its Director of Operations ("Defendant Smith"), its Transportation Supervisor ("Defendant Jensen"), and its former Chief Mechanic ("Defendant Nichols") seeking compensatory damages, punitive damages, and attorney's fees. *See generally* Dkt. No. 1, Compl.  Pending before the Court are Defendants' motion for judgment on the pleadings, *see* Dkt. No. 13, and their motion for summary judgment, *see* Dkt. No. 58, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

### II. BACKGROUND

The majority of Plaintiff's gender-discrimination claims stem from issues with Defendant Nichols.[2]  Plaintiff worked for Defendant District for four or five years before she began having issues with Defendant Nichols in 2005.  *See* Dkt. No. 58-2, Defs' Stmt. of Facts, at ¶¶ 1, 8, 15.[3]

---

[1] Defendants filed the pending motion for judgment on the pleadings on February 25, 2019. The parties conducted discovery while awaiting the Court's decision on that motion, and Defendants later filed the pending motion for summary judgment on January 31, 2020.  The Court addresses both motions in this Memorandum-Decision and Order.

[2] Although, in her complaint, Plaintiff also alleges that Defendant Smith engaged in gender-based discrimination for using the word "cunt" in the workplace, saying women bus drivers were "cancer" within Defendant District, and making a comment that women should be born without tongues so that they cannot talk but can still perform oral sex. *See id.* at ¶ 24; *see also* Dkt. No. 1 at ¶¶ 25-26. However, Plaintiff admits that she never reported Smith's remarks to anyone. *See* Dkt. No. 58-2, Defs' Stmt. of Facts, at ¶ 24. She also never made any complaints about Defendants Jensen or Kisloski and admits that Defendant Kisloski never used any inappropriate language in the workplace. *See id.* at ¶¶ 29-30.

[3] The Court references Plaintiff's Response to Defs' Stmt. of Material Facts, *see* Dkt. No. 60-1, when there are minor discrepancies, such as word-choice or conclusions of law; but the Court emphasizes that all of the facts in this section are undisputed.

Generally, those issues included Defendant Nichols being silent to her, leaving notes on her bus to clean it, giving her the finger once while they were driving past each other, swearing at her, raising his voice, slamming doors, and once throwing a ladder (though Plaintiff admits she was not at work when the ladder was supposedly thrown). *See id.* at ¶¶ 16-18, 20. Plaintiff complained of these issues to her first-level supervisor, Defendant Jensen, her second level supervisor, Defendant Smith, and later to Defendant Kisloski. *See id.* at ¶¶ 13, 16, 35-38. Plaintiff admits, however, that she never made any accusations against Defendant Nichols of gender-based discrimination. *See id.* at ¶ 34. Plaintiff met with all three of her supervisors in February of 2016 about her issues with Defendant Nichols, in which Defendant Kisloski informed her that the two would learn to get along or one or both of them would be fired. *See id.* at ¶ 44. After this meeting, Plaintiff tried to "avoid" Defendant Nichols, but there was no substantial change in their relationship, and they continued to have problems. *See id.* at ¶¶ 52, 58-59, 64-65.

Two events in particular ultimately led to Plaintiff's termination. First, sometime in October of 2016, Plaintiff deviated approximately four miles in total from her bus route while transporting children from TST BOCES in Ithaca back to Defendant District so that she could look for recycled glass bottles to use for crafts. *See id.* at ¶¶ 73, 83; Dkt. No. 60-1 at ¶ 73. Plaintiff did not have permission to deviate from her route in that manner. *See* Dkt. No. 58-2 at ¶ 80.

Second, on December 6, 2016, Plaintiff parked her bus in front of a garage bay door, thus blocking the entrance and exit; and Defendant Nichols told her she could not leave her bus there. *See id.* at ¶ 86; Dkt. No. 60-1 at ¶ 86. The parties argued, and Plaintiff testified that

Defendant Nichols was "loud" and used profanity during the dispute. *See* Dkt. No. 60-1 at ¶ 86. Plaintiff admits that she was aware that she was not supposed to leave her bus in front of the garage bay door in that manner and that Defendant Jensen eventually moved the bus for her during the incident in an attempt to diffuse the situation. *See* Dkt. No. 58-2 at ¶¶ 87-88. After Defendant Smith arrived at the bus garage, he directed Plaintiff to sit in her car; and she refused before ultimately complying with his direction. *See id.* at ¶ 96.

Plaintiff met with Defendants Kisloski and Smith on December 8, 2016, to discuss her detour from her bus route in October and the incident on December 6th. *See id.* at ¶ 105. At the meeting, Plaintiff admitted to the facts surrounding the October 2016 detour; and, as a result of her admission, she was placed on administrative leave. *See id.* at ¶¶ 105, 110. In late December of 2016, Defendant District notified Plaintiff that she was subject to disciplinary charges and would be provided a Civil Service Law Section 75 hearing. *See id.* at ¶ 114.

Defendant District filed four disciplinary charges against Plaintiff on December 20, 2016, all stemming from her bus route deviation in October 2016 and her altercation with Defendants Nichols and Smith on December 6, 2016. *See id.* at ¶ 115. The section 75 disciplinary hearing took place on January 20, 2017, before a hearing officer. *See id.* at ¶ 123. During the hearing, Plaintiff was represented by counsel, had the ability to examine and cross-examine witnesses, and testified on her own behalf. *See id.* at ¶¶ 123-124, 126. On March 3, 2017, the hearing officer found that Plaintiff was guilty of misconduct because she (1) took an unauthorized detour in October of 2016, (2) acted "unprofessionally" with Defendant Nichols on December 6, 2016, and (3) was insubordinate when she did not comply with Defendant Smith's first directive to leave the building on December 6, 2016. *See generally* Dkt. No. 58-20, Ex. N, Hearing Officer's Findings of Fact and Recommendation. On March 7, 2017,

Defendant District's Board of Education adopted the hearing officer's findings of fact and terminated Plaintiff's employment. *See* Dkt. No. 58-2 at ¶ 193.

During the course of these events, Plaintiff filed two complaints with the Equal Employment Opportunity Commission ("EEOC"), which were also filed with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and retaliation.[4] Plaintiff's retaliation claim stemmed from a report Defendant Kisloski received on January 25, 2017, that Plaintiff had carried a pistol in her purse while driving her bus in 2014 or 2015. *See* Dkt. No. 13-5, Ex. F. The NYSDHR found no probable cause for either claim. *See* Dkt. Nos. 13-6, Ex. F and 13-7, Ex. H. Plaintiff then filed her complaint in the instant action on October 23, 2018. *See generally* Dkt. No. 1.[5]

## III. DISCUSSION

### A. Legal standards

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citations omitted). Thus, when considering such a motion, a court must "'construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quotation omitted).

---

[4] There is some dispute regarding the dates on which Plaintiff filed these complaints. The Court addresses this issue later in the Memorandum-Decision and Order.

[5] Plaintiff's complaint is drafted so poorly that the Court cannot discern what causes of action she is alleging. Relying on the arguments set forth in the parties' submissions, the Court surmises that her causes of action are based on gender discrimination, retaliation, and a hostile work environment pursuant to Title VII and individual and municipal liability based on gender discrimination brought pursuant to 42 U.S.C. § 1983. *See generally* Dkt. No. 1.

Although a plaintiff is not required to plead "detailed factual allegations," a plaintiff is required to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action…" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). Finally, in deciding a motion for judgment on the pleadings, a court may consider the pleadings, documents attached thereto as exhibits, documents incorporated by reference, documents that are integral to the complaint, and matters upon which the court may take judicial notice. *See Holland v. City of New York*, No. 10 Civ. 2525 (PKC) (RLE), 2011 U.S. Dist. LEXIS 144941, *9 (S.D.N.Y. Dec. 16, 2011) (quotations and other citations omitted).

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under this Rule, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, a court must resolve any ambiguities and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

**B. Defendants' motion for judgment on the pleadings**

**1. Exhaustion of administrative remedies**

The only issue Defendants raised in their motion for judgment on the pleadings that they did not reargue in their motion for summary judgment was whether the Court should dismiss some of Plaintiff's claims for failure to exhaust her administrative remedies. Specifically, Defendants argue that Plaintiff did not include claims for disparate impact or pattern or practice discrimination in her EEOC complaint and that these claims are not reasonably related to the instances of discrimination that she alleged in her complaint. *See* Dkt. No. 25, Defs' Reply in

Support of Mot. on Pleadings, at 8-9.  Defendants also assert that Plaintiff is limited to the factual allegations of acts of discrimination included in her EEOC complaint.  *See id.* at 9.

"A plaintiff may bring an employment discrimination action under Title VII … only after filing a timely charge with the EEOC or with 'a State or local agency with authority to grant or seek relief from such practice.'"  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82-83 (2d Cir. 2001) (quoting 42 U.S.C. § 2000e-5(e)) (other citation omitted).  "Exhaustion of remedies is a precondition to suit … and a plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge."  *Id.* at 83 (citations omitted).  "A claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"  *Id.* (quoting *Butts* [*v. City of New York Dep't of Hous. Pres. & Dev.*], 990 F.2d [1397,] 1402 [(2d Cir. 1993)] (internal quotation marks omitted)).  The Second Circuit has "described this as 'essentially an allowance of loose pleading.'"  *Id.* (citing [*Butts*, 990 F.2d at 1402]) (footnote omitted).  The Supreme Court in *Patsy v. Bd. of Regents*, however, "held very broadly that exhaustion of administrative remedies is not required in a § 1983 action."  *Branch v. Guilderland Cent. Sch. Dist.*, 239 F. Supp. 2d 242, 251 n.6 (N.D.N.Y. 2003) (Hurd, J.) (citing [*Patsy v. Bd. of Regents,*] 457 U.S. [496] 516, 102 S. Ct. 2557, [(1982)]).

Thus, to avoid dismissal based on failure to exhaust administrative remedies, Plaintiff must have complained about gender-based discrimination, retaliation, and the alleged hostile work environment in her complaints to the NYSDHR and EEOC.  However, Plaintiff was not

required to allege facts supporting her individual or municipal liability claims against Defendants for gender discrimination brought pursuant to 42 U.S.C. § 1983.

In her first EEOC complaint, Plaintiff stated that she was a female and a qualified individual with a disability (a heart condition) who had worked as a bus driver for Defendant District since May 17, 2001. *See* Dkt. No. 13-4, Ex. E, at 4. Plaintiff alleged that, beginning on or about 2006 and continuing to date, she was subjected to "unwelcome comments and actions because of [her] gender." *See id.* Plaintiff claimed that there was a "boy's club" atmosphere where profanity was common, and someone had gone through her locker and personal items. *See id.* Plaintiff further alleged that, on or about December 6, 2016, she was in a verbal altercation with her boss and she was "falsely accused of insubordination[.]" *See id.* Plaintiff claimed that the symptoms of her disability became very severe and she asked for time to calm down as a reasonable accommodation in order to seek medical assistance. *See id.* Plaintiff alleged that her request was denied, and she was told to go sit in her car. *See id.*

Plaintiff further alleged that, as a result, she was hospitalized and taken out of work. *See id.* at 6. Plaintiff claimed that, when she turned in her doctor's excuse for her absence, Defendant Kisloski requested that she report to his office the next day. *See id.* Plaintiff claimed that she was served papers and put on administrative leave within minutes of turning in her sick leave papers. *See id.* Plaintiff also alleged that, when she returned to work, she was accused of confrontation, insubordination, and going off-route. *See id.* Plaintiff claimed that, when she spoke with the Defendant Kisloski, he threatened her and told her to resign. *See id.* Plaintiff further complained that she had been subjected to a hostile, offensive, and intimidating work environment because of her gender and disability in willful violation of Title VII and the ADA. *See id.*

In Plaintiff's second complaint with the EEOC, she stated that "[o]n or about January 12, 2017, I filed an [EEOC] charge of discrimination" and, "[o]n or about January 25, 2017, I was informed that [Defendant District] had pressed criminal charges against me for carrying a pistol on a bus." *See* Dkt. No. 13-5, Ex. F, at 4. Plaintiff alleged that such accusation was "absolutely false." *See id.* However, Plaintiff claimed she was told that, if she resigned from her position and withdrew her charge with the EEOC, the criminal charges would be dropped. *See id.* Plaintiff further claimed that, on or about March 7, 2017, she was terminated. *See id.* at 6. Plaintiff alleged that she "believed [Defendant District] falsely accused [her] of carrying a pistol, pressed criminal charges against [her] and terminated [her] in retaliation for having filed a prior EEOC charge…" *See id.*

Under the "loose" pleading standard described in *Holtz*, the Court finds that Plaintiff's additional allegations in her complaint in this action were "reasonably related" to her complaints to the NYSDHR and EEOC that she was discriminated and retaliated against because of her gender and that she suffered a hostile work environment. Regarding Defendants' claims that Plaintiff did not allege a "policy or practice" in these complaints, this does not preclude her from bringing claims pursuant to 42 U.S.C. § 1983 in federal court as there is "no exhaustion of remedies" requirement. *See Branch*, 239 F. Supp. 2d at 251 n.6. Thus, the Court denies Defendants' motion for judgment on the pleadings based on the theory of failure to exhaust administrative remedies.

### C. Defendants' motion for summary judgment

#### 1. Collateral estoppel

Defendants argue that Plaintiff is bound by the section 75 hearing officer's findings of fact and recommendation. *See* Dkt. No. 58-1, Defs' Memorandum in Support Mot. Summ. J, at

7-10.  "State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings."  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 45 (2d Cir. 2014) (citations omitted).  "'New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate.'"  *Id.* (quoting *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir.), *cert. denied,* 546 U.S. 1062, 126 S. Ct. 801, 163 L. Ed. 2d 628 (2005)).  "This rule applies to findings made by administrative officers after conducting section 75 hearings."  *Id.* (citing *e.g.*, *In re Cheeseboro*, 84 A.D.3d 1635, 1636, 923 N.Y.S.2d 772, 773 (3d Dep't 2011) (deciding that a finding of fact by a section 75 hearing officer that unemployment-insurance applicant had been terminated from prior employment for cause had preclusive effect with regard to a denial of a benefits application)).

　　"Like a prior judicial finding of fact, in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication."  *Id.* (citing Restatement (Second) of Judgments § 27 (1982)) (footnote omitted).  "But even if an identical issue was necessarily decided in the prior proceeding, issue preclusion does not apply unless there was 'a full and fair opportunity [for the party against whom preclusion is sought] to contest the decision now said to be controlling.'"  *Id.* at 45-46 (quoting *Buechel v. Bain*, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919, 740 N.Y.S.3d 252, 257 (2001)).

　　In *Matusick*, the section 75 hearing related to the defendant's articulated basis for terminating the plaintiff.  *See id.* at 47-48.  The Second Circuit noted that there was no indication that the hearing officer was ever presented with evidence that the charges against the plaintiff were motivated, even in part, by an intent to discriminate, which was "at the heart" of

the disparate treatment claims in the federal case. *See id.* at 48. Furthermore, the court stated that there was no indication that, had the hearing officer heard the evidence, it would have been within his statutorily defined authority to review that allegation, or that he would have found that the plaintiff's termination was warranted. *See id.* This is because "[a] section 75 hearing officer's sole responsibility is to consider whether the state employee facing charges has been 'incompeten[t] or [committed] misconduct.'" *Id.* at 48 n.11 (quoting N.Y. Civ. Serv. Law § 75(1)).

Nonetheless, the Second Circuit ruled that the hearing officer made findings of fact that bore on the issues raised on appeal, *i.e.*, that the plaintiff "had actually committed misconduct and that his conduct at work evinced an incompetence and carelessness not befitting his role as a dispatcher for a water authority." *Id.* at 48. The court found that, because the section 75 framework substantially differs from the legal framework for state and federal employment discrimination law, the hearing officer's conclusions did not preclude the jury from finding that the plaintiff was terminated for other, additional reasons, such as discrimination or retaliation. *See id.* at 49. The Second Circuit ultimately held that the plaintiff was precluded from arguing that he had failed to perform some of his duties, and "[t]he *factual* findings supporting the hearing officer's ultimate conclusion" must be accepted by the jury, even if the jury found that defendants terminated the plaintiff for illegal reasons. *Id.* (emphasis in original).

In other words, a plaintiff "is precluded from arguing that she did not engage in 'misconduct/insubordination'" but she is not precluded from arguing that she "'was also' … terminated 'at least in part because' of discrimination or retaliation." *Imperato v. Otsego Cnty. Sheriff's Dep't*, No. 3:13-cv-1594 (BKS/DEP), 2016 U.S. Dist. LEXIS 50155, *41 (N.D.N.Y. Apr. 14, 2016) (quotation omitted).

Here, the hearing officer made several findings of fact, including that Plaintiff committed misconduct by knowingly deviating from her bus route in October of 2016, without approval from anyone in Defendant District, in hopes of finding discarded wine bottles at "The Barn" that she could use to make tiki torches. *See* Dkt. No. 58-20, Ex. N at 5-6. The hearing officer also found that Plaintiff's failure to move her bus from in front of the garage door constituted misconduct and that she "created an unnecessary problem" by leaving her bus out front. *See id.* at 7-9. Furthermore, the hearing officer found that Plaintiff's reaction to Defendant Nichols's request that she move the bus amounted to "an unprofessional verbal tirade" which was "inappropriate and unprofessional." *See id.* Finally, the hearing officer found that Plaintiff's failure to follow Defendant Smith's first directive to leave the building on December 6, 2016, to diffuse the situation, constituted insubordination and misconduct. *See id.* at 10-11.

The hearing officer also considered Plaintiff's claim that the disciplinary proceeding was a pretext for discrimination on the basis of disability. *See id.* at 13. The hearing officer found no credible evidence that Defendant District officials had sufficient knowledge of Plaintiff's disability, and the medical notes lacked specificity and provided no indication that she had an impairment that substantially limited a major life activity. *See id.* at 13-14.

The hearing officer ultimately found that "[t]he totality of [Plaintiff's] conduct indicates a significant and continuing unwillingness to adhere to the basic and reasonable expectations of her employer that she safely transport students, that she cooperate with co-workers and that she follow instructions from supervisors. Her conduct is unacceptable in the workplace and warrants termination." *See id.* at 14. Based on the above-stated facts and caselaw, the Court finds that it must accept the hearing officer's findings of fact, including his findings that

Plaintiff committed misconduct warranting termination. However, because the hearing officer did not consider whether Plaintiff was also terminated because of discrimination or retaliation, Plaintiff is *not* precluded from claiming that Defendants discriminated or retaliated against her because of her gender or that she suffered a hostile work environment.

### 2. *Plaintiff's Title VII hostile work environment claim*

"In order to state a claim for a hostile work environment under Title VII, the underlying harassment alleged 'must be sufficiently severe or pervasive,' both subjectively and objectively, 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Seale v. Madison Cnty.*, 929 F. Supp. 2d 51, 66 (N.D.N.Y. 2013) (Suddaby, J.) (quoting *Redd* [*v. New York Div. of Parole*,] 678 F.3d [166,] 175 [(2d Cir. 2012)] (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); *Harris*, 510 U.S. at 21-22, 114 S. Ct. 367)). "Further, the plaintiff must allege facts plausibly suggesting that the hostile or abusive treatment was because of his or her membership in a class of persons protected by Title VII." *Id.* (citing *Redd*, 678 F.3d at 175). "The types of workplace conduct that may be actionable on a claim for hostile work environment based on sex 'include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Id.* (quoting *Meritor* [*Sav. Bank, FSB v. Vinson*,] 477 U.S. [57,] 65, 106 S. Ct. 2399 (citing 29 C.F.R. § 1604.11(a) (1985))). "A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Redd*, 678 F.3d at 175) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367)).

"It is important to keep in mind, however, that 'while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace.'" *Id.* (quotation omitted). "Title VII is 'meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency.'" *Id.* (quoting *Taylor v. New York City Dep't of Educ.*, No. 11-CV-3582, 2012 U.S. Dist. LEXIS 108319, *8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio*, 46 F. Supp. 2d 206, 213-14 (E.D.N.Y. 1999))).[6]

Here, Plaintiff does not dispute Defendants' contention that her complaint boils down to "petty personality conflicts" with Defendant Nichols, who was not in a supervisory position over her. *See* Dkt. No. 58-1 at 12. In fact, Plaintiff admitted that the totality of her issues with Defendant Nichols amounted to the following: (1) his being silent to her in the workplace; (2) raising his voice; (3) slamming doors; (4) once throwing a ladder, even though she was not present when it was thrown; (5) leaving notes on her bus to clean it; (6) giving her the middle finger once when they were driving by each other, though she does not recall when; (7) using profanity in the workplace, though she admits that men and women – including herself – used foul language in the workplace; and (8) reacting negatively when she brought mechanical issues with her bus to his attention. *See* Dkt. No. 62, Defs' Reply in Support of Mot. Summ J., at 8; *see also* Dkt. No. 58-2 at ¶¶ 16-18, 20; Dkt. No. 60-1 at ¶¶ 16-18, 20. Defendants contend that these issues were "nothing more than gender neutral instances of minor incivility." *See* Dkt.

---

[6] "In addition to establishing that she was subjected to a hostile work environment, [a] [p]laintiff must also establish that the conduct which created the hostile environment should be imputed to the employer." *Shiner v. State Univ. of N.Y.*, No. 11-CV-01024, 2012 U.S. Dist. LEXIS 157728, *11 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001)). However, because the Court ultimately finds that Plaintiff has not established a *prima facie* case for her hostile work environment claim, it need not determine whether the complained of conduct should be imputed to Defendant District.

No. 62 at 8.  Furthermore, Plaintiff conceded that Defendant Nichols never used any negative gender-based language towards her or touched her in an inappropriate manner due to her gender.  *See id.*; *see also* Dkt. No. 58-2 at ¶ 19; 60-1 at ¶ 19.

The only issue that Plaintiff alleged was gender-based was that Defendant Nichols "did not treat the male employees the way he treated the female employees, when men reported problems with their busses."  *See* Dkt. No. 60-1 at ¶ 17-a.  However, Plaintiff conceded that Defendant Nichols had frequent confrontations with male employees, including Randy Murray. *See* Dkt. No. 58-2 at ¶ 21; 60-1 at ¶ 21.  Plaintiff's witnesses, Rachel Shaver and Pamela Krause, testified that there were often conflicts between Defendants Nichols and Jensen and that Defendant Nichols confronted Michael Middaugh in the workplace.  *See* Dkt. No. 58-2 at ¶¶ 170-72, 189; *see also* Dkt. No. 60-1 at ¶¶ 170-72, 189, 189-a.  As Defendants aptly describe him, Defendant "Nichols was an equal opportunity unpleasant coworker."  *See* Dkt. No. 58-1 at 14.  The Court finds that these facts show that Defendant Nichols treated both males and females in the workplace equally and that any harassment that Defendant Nichols directed towards Plaintiff was gender-neutral and not so severe or pervasive as to create a hostile work environment.

Defendant Smith is the only other Defendant whom Plaintiff alleges created a hostile work environment.  Plaintiff claims that he called Rene Shaver a "cunt," told a "whole bunch" of employees that women were cancer on the school, and made a crude comment that women should be born without tongues.  *See* Dkt. No. 60, Pl's Memorandum in Opposition Mot. Summ. J, at 4.  However, Plaintiff admitted that none of this language was directed at her, but rather at other individuals, and she just happened to be present to overhear it.  *See* Dkt. No. 58-2 at ¶ 24; Dkt. No. 60-1 at ¶ 24.  Furthermore, those comments were made prior to February of

2016, more than 300 days before she filed the instant complaint, and she admits she never reported them to anyone. *See* Dkt. No. 58-2 at ¶ 24; Dkt. No. 60-1 at ¶ 24. Regarding the crude comment about women's tongues, Shaver testified that the comment took place in 2003 or 2004, more than fifteen years ago; and Defendant Smith apologized to Shaver. *See* Dkt. No. 58-2 at ¶ 169; Dkt. No. 60-1 at ¶ 169.

Based on these undisputed facts, the Court finds that Plaintiff has not met her burden to show that she experienced a hostile work environment under Title VII because the alleged facts did not create an environment of abuse that was so severe or pervasive as to alter the conditions of her employment. Thus, the Court grants Defendants' motion for summary judgment with respect to this claim.

### 3. *Plaintiff's Title VII gender-based discrimination claim*

Employment discrimination cases are analyzed using the "*McDonnell Douglas* test," a three-stage, burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the "*McDonnell Douglas* test," a plaintiff must first establish a *prima facie* case of discrimination by showing that "'(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1877)).

After a plaintiff has established a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). At that point, the burden shifts to the employer to "'articulate some legitimate,

nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817). If the employer can articulate such reasons for its actions, then "the burden shifts back to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Id.* (quoting [*McDonnell Douglas*, 411 U.S.] at 804, 93 S. Ct. 1817) (other citation omitted).

The parties do not dispute that Plaintiff is a woman, and thus she is a member of a protected class, nor do they dispute that she was qualified for her position with Defendant District. Although Defendants contend that Plaintiff did not allege an adverse employment action, Defendant District's Board of Education terminated Plaintiff's position on March 7, 2017. *See* Dkt. No. 58-2 at ¶ 193. Plaintiff's termination clearly establishes an adverse employment action to satisfy the third element of her *prima facie* claim of discrimination. *See Vega,* 801 F.3d at 85

Finally, the parties dispute whether Plaintiff has established the fourth element of her *prima facie* claim, i.e., that the relevant circumstances give rise to an inference of discrimination. Plaintiff argues that men were permitted to deviate from their bus route and make personal stops. *See* Dkt. No. 60 at 13 (citing Dkt. No. 58-17, Krause Depo, at 40). Plaintiff also claims that she was not able to keep personal items on her bus while males were allowed to do so, she was compelled to write a letter stating that she enjoyed her job when she attempted to complain about the discriminatory conduct to which "all female drivers" were subjected, and her supervisor, Defendant Smith, once made a crude statement that women should be born without tongues. *See id.* at 14.

Plaintiff cites to Pamela Krause's deposition testimony to support her allegation that male drivers were permitted to make personal stops while transporting students. However, this

is a mischaracterization of Ms. Krause's testimony. She did not testify that males were permitted to make personal stops while transporting students during the day. *See generally* Dkt. No. 58-17. Ms. Krause stated that on field trips or sports trips bus drivers (both male and female) could use the bus for personal pursuits such as traveling to a shopping mall or place to eat "within reason." *See id.* at 41. Ms. Krause clarified, however, that, while driving on a regular bus run delivering children to school and picking them up from school, bus drivers were *not* allowed to make personal stops. *See id.* at 40-41. Therefore, this does not show an inference of discrimination surrounding the circumstances of Plaintiff's termination; and, in fact, supports Defendants' legitimate, non-discriminatory reasons for terminating her.

Furthermore, Plaintiff does not point to any evidence to support her claim that she was unable to keep personal items on her bus while males were allowed to do so. In fact, Plaintiff admitted that she left personal items on her bus *in violation* of workplace policy. *See* Dkt. No. 58-2 at ¶ 65 (citing Dkt. No. 58-7, Ex. A, Pl's Depo, at 59); Dkt. No. 60-1 at ¶ 65. Defendant Nichols repeatedly directed Plaintiff to remove those items from her bus, and she reported those requests to Defendant Smith. As a result, Plaintiff met with Defendants Smith and Nichols and addressed the topic. *See* Dkt. 58-2 at ¶ 65 (citing Dkt. No. 58-7, Ex. A at 60-61); Dkt. No. 60-1 at ¶ 65. Plaintiff further admitted that Defendant Nichols posted a note to *all* bus drivers indicating that, if an item did not fit in their cubby, it could not be left on the bus and he warned her and five other drivers about leaving personal items on their buses after a run was complete. *See* Dkt. No. 58-2 at ¶¶ 66, 67; Dkt. No. 60-1 at ¶¶ 66, 67. Thus, this example does not reveal an inference of gender-based discrimination.

Regarding the letter, Plaintiff testified at her deposition that, in February of 2016, she met with Defendant Kisloski, and he asked her "to write a letter in order to keep [her] job"

about why she "liked [her] job." *See* Dkt. No. 58-7, Ex. A at 62. During the meeting, Plaintiff

alleges that Defendant Kisloski told her that, if she and Defendant Nichols could not get along,

he was going to fire one or both of them. *See id.* at 63. In Plaintiff's letter, dated February 9,

2016, she wrote to Defendant Kisloski "you asked me to spend some time to reflect and think

about 2 questions. The first question: Do I like my job and the second: What do I need to

happen to remain a positive part of our educational environment." *See* Dkt. No. 58-12, Ex. F.

The context of this meeting and Plaintiff's letter do not show that she was compelled to write

the letter as a form of discrimination or instead of making a complaint. It appears that

Defendant Kisloski asked her to write the letter as a response to her complaints, to reflect on

and recommend changes in the workplace. Furthermore, Plaintiff does not allege that she was

singled out to write the letter because she was a woman or to keep her from complaining about

discrimination. Thus, this example does not reveal Defendants' discriminatory intent.

Finally, with respect to Defendant Smith's remark about women being born without

tongues, the remark was made fifteen years ago, not in Plaintiff's presence, and has absolutely

nothing to do with her termination. For all of these reasons, the Court finds that Plaintiff has

not satisfied the final element of her *prima facie* case of showing that the circumstances

surrounding her termination allow an inference of discrimination and grants Defendants' motion

for summary judgment with respect to this claim.

### 4. *Plaintiff's Title VII gender-based retaliation claim*

Title VII of the Civil Rights Act of 1964 includes an anti-retaliation provision, making it

unlawful "for an employer to discriminate against any of his employees … because [the

employee] has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This

provision "is intended to further the goals of the anti-discrimination provision 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting [*Burlington Northern & Santa Fe Ry. v.] White*, 548 U.S. [53,] 63, 126 S. Ct. 2405 [(2006)]). Courts evaluate Title VII retaliation claims under the three-step burden-shifting analysis set out in *McDonnell Douglas. See id.*

"First, the plaintiff must establish a *prima facie* case of retaliation by showing: '"(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."'"[7] *Id.* (quotation omitted). The plaintiff's burden in proving a *prima facie* case is "de minimis." *Id.* It is the court's role in evaluating a summary judgment motion "'to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Id.* (quotation omitted).

If the plaintiff sustains this initial burden, "'a presumption of retaliation arises,'" and the burden shifts to the defendant. *Id.* (quotation omitted). Once the burden shifts to the defendant, it must then "'articulate a legitimate, non-retaliatory reason for the adverse employment action.'" *Id.* (quotation omitted). If the defendant can do this, then the "presumption of retaliation dissipates" and the burden shifts back to the employee to show that the retaliation "'was a substantial reason for the adverse employment action.'" *Id.* (quotation omitted). "A

---

[7] Defendants appear to use a different standard, one for post-employment retaliation, but it includes these same elements. Because Plaintiff alleges that Defendants' retaliation occurred *before* she was terminated on March 7, 2017, the Court finds that the regular Title VII retaliation standard is appropriate.

plaintiff can sustain this burden by proving that 'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause. . . .'" *Id.* (quotation omitted).

Plaintiff's second EEOC complaint, received by the EEOC on May 17, 2017, alleges that Plaintiff filed her first EEOC complaint of discrimination on January 12, 2017.[8] *See* Dkt. No. 13-5, Ex. F at 4. Plaintiff then claimed that, "[o]n or about January 25, 2017, I was informed that [Defendants] had pressed criminal charges against me for carrying a pistol on a bus. This is an accusation that is absolutely false. I was told that if I resigned from my position and withdrew my charge with the EEOC the criminal charges would be dropped." *See id.* Plaintiff then added that, "[o]n or about March 7, 2017, I was terminated. I believe [Defendants] falsely accused me of carrying a pistol, pressed criminal charges against me and terminated me in retaliation for having filed a prior EEOC charge in willful violation of Title VII…" *See id.* at 6.

Plaintiff has established at least the first and third elements of a retaliation claim. She engaged in a protected activity by filing her first complaint with the EEOC on January 12, 2017,

---

[8] The dates surrounding Plaintiff's two EEOC complaints cannot easily be identified by looking at the documents. Both EEOC complaints were notarized on May 15, 2017. *See* Dkt. Nos. 13-4, Ex. E and 13-5, Ex. F. However, in Plaintiff's complaint for retaliation she specifically addresses the EEOC complaint she made for discrimination on January 12, 2017. *See* Dkt. No. 13-5, Ex. F at 4. The NYSDHR Order and Determination, however, stated that the first complaint was filed on February 27, 2017. *See* Dkt. No. 13-6, Ex. G at 2. In Plaintiff's deposition, she claimed that she filed the first complaint in either late December 2016 or early January 2017 with the EEOC, and it appears she claims that the case was transferred to the NYSDHR on February 27, 2017. *See* Dkt. No. 58-7, Ex. A at 129-132. The date Plaintiff first filed her claim with the EEOC is important because her retaliation claim would be illogical if she filed her first EEOC complaint in February 2017. Thus, for purposes of this Memorandum-Decision and Order, the Court treats the filing date of the first EEOC complaint as January 12, 2017.

and she was terminated from her position on March 7, 2017.[9]  Defendants admit that Plaintiff

can prove that it had knowledge of her first EEOC complaint.  *See* Dkt. No. 58-1 at 22.  Thus,

the issue the Court must address is whether Plaintiff satisfied the fourth element, i.e., whether

there was a causal connection between Plaintiff's filing her first EEOC complaint and her

termination.

 The evidence clearly demonstrates that Defendant District sought to terminate Plaintiff's

as early as December 8, 2016, when she was placed on administrative leave after refusing to

resign.  *See* Dkt. No. 58-22, Ex. P at 2.  In addition, Defendant District notified Plaintiff of the

disciplinary charges on December 20, 2016.  *See* Dkt. No. 58-2 at ¶ 115.  For these reasons,

Plaintiff has not established a causal connection to satisfy the fourth element of her retaliation

claim.

 **5.  *Plaintiff's claims pursuant to 42 U.S.C. § 1983***

  **a.  *Supervisory liability*[10]**

 Courts analyze discrimination claims brought pursuant to 42 U.S.C. § 1983 the same as

claims brought under Title VII.  Unlike Title VII, however, in § 1983 claims "[a]n individual

---

[9] The Court does not address whether "pressing criminal charges" against Plaintiff constitutes an adverse employment action because the facts clearly show that Defendant District only forwarded the report to the police and took no further action.  Notably, Plaintiff was already on administrative leave, which had commenced on December 8, 2016, at the time her alleged prior pistol possession was reported.  Neither the police nor Defendant District pursued the criminal case.  *See* Dkt. No. 60 at 16 (citing Dkt. No. 58-9, Ex. C, Def. Kisloski Aff., at ¶ 6; Dkt. No. 60-1 at ¶¶ 153-a, 154-a).

[10] In her complaint, Plaintiff seeks to hold the named defendants liable in both their individual and official capacities.  *See generally* Dkt. No. 1.  Plaintiff's counsel admits that her claims against the named Defendants in their official capacities are redundant of her claim against Defendant District.  *See* Dkt. No. 23 at 7, n.3.  Thus, the Court addresses these claims as only against the named Defendants in their *individual* capacities and dismisses any claims against them in their *official* capacities.

may be held liable … only if that individual is 'personally involved in the alleged deprivation.'"

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)) (other citations omitted).  The Second Circuit has held that personal involvement can be established by showing the following:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference … by failing to act on information indicating that unconstitutional acts were occurring."

*Id.* (quoting *Back*, 365 F.3d at 127).

If the defendant is a supervisor, then "'a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. Finally, as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic …'"  *Id.* (quoting *Raspardo [v. Carlone,]* 770 F.3d [97,] 116 [(2d Cir. 2014)] (citation omitted)).

Defendant Kisloski, as Superintendent of Schools, was clearly a "supervisor" in that he had the authority to hire, fire, demote, promote, transfer, or discipline employees.  *See Vance v. Ball State Univ.*, 570 U.S. 421, 425 (2013).  Plaintiff also indicated that Defendant Smith hired her and promoted Defendant Nichols, and thus he was a "supervisor" as well.  *See* Dkt. No. 58-2 at ¶ 4.  She also referred to Defendant Jensen as her immediate supervisor, so the Court also treats him as a supervisor for this claim.  *See id.* at 13.[11]

---

[11] The parties do not discuss whether Defendant Nichols should be held individually liable under § 1983, and they concede that he was not Plaintiff's supervisor.  However, because

Plaintiff does not allege that Defendant Kisloski directly participated in any discrimination such as making gender-based derogatory remarks or treating her differently from men. Although in her complaint Plaintiff alleges that Defendant Kisloski, as Superintendent, perpetuated a policy of discriminating against female bus drivers, Plaintiff provides no evidence at this stage in the proceedings to support this contention. *See* Dkt. No. 1 at ¶ 68. Plaintiff's only complaint about Defendant Kisloski is that she reported Defendant Nichols's conduct to him, and she alleges that Defendant Kisloski gave her an ultimatum that she and Defendant Nichols would get along or one or both of them would be fired. *See* Dkt. No. 60 at 16. As discussed above, Plaintiff also contends that Defendant Kisloski required Plaintiff to write a letter to keep her job. *See id.* According to Plaintiff, Defendant Kisloski used the December 6, 2016 incident as pretext to cover up the discriminatory conduct to which Plaintiff had been subjected. *See id.*

Plaintiff reported her problems with Defendant Nichols to Defendant Kisloski, but none of these problems stemmed from *discrimination*. In fact, Plaintiff admits that "during the entire pendency of her employment with Defendant [District], she never made an accusation of sex-based discrimination regarding [Defendant] Nichols …". *See* Dkt. No. 58-2 at ¶ 34 (citing Dkt. No. 58-7, Ex. A at 125); Dkt. No. 60-1 at ¶ 34.[12] Because Defendant Kisloski did not have any

Defendant Nichols's conduct was gender-neutral, he cannot be held individually liable under § 1983.

[12] The Court also notes that Defendant Kisloski acted on Plaintiff's reports of problems with Defendant Nichols. For example, Plaintiff admits that, on October 12, 2016, she complained to Defendant Kisloski regarding an incident where Defendant Nichols placed a screw through a lock on her bus, rendering it inoperable. *See* Dkt. No. 58-2 at ¶ 58; Dkt. No. 60-1 at ¶ 58. On October 14, 2016, Defendants Jensen and Smith informed Plaintiff that Defendant Nichols was disciplined for his actions, that he was "reflecting" on his actions for a week, and told her that the incident was not being taken lightly. *See* Dkt. No. 58-2 at ¶ 59; Dkt. No. 60-1 at ¶ 59.

personal involvement in Plaintiff's alleged discrimination, the Court dismisses her § 1983 supervisory claim against him.

Plaintiff repeatedly alleged that Defendant Smith made crude comments about women. *See* Dkt. No. 23, Pl's Memorandum in Opposition Mot. on Pleadings, at 13. Plaintiff also claimed that Defendant Smith promoted Defendant Nichols, despite Defendant Nichols's regular conduct, such as using "daily sexual epithets" and "forcibly breaking into the compartment on [ ] [P]laintiff's bus to remove her personal items and throwing them on the floor." *See id.* However, as already addressed, Defendant Smith's alleged offensive remarks were made years ago, to other women, and were not personal to her. Plaintiff also admitted that she did not complain of gender discrimination to Defendant Smith; and, whenever she did complain to him about Defendant Nichols, he was helpful to her in working out their issues. *See* Dkt. 58-1 at ¶ 37 (citing Dkt. No. 58-7, Ex. A at 35); Dkt. No. 60-1 at ¶ 37. For these reasons, the Court finds that Defendant Smith cannot be held individually liable under § 1983.

Finally, Plaintiff claimed that Defendant Jensen, her immediate supervisor, did nothing to ameliorate the discriminatory conduct of which she complained. *See* Dkt. No. 23 at 16. Plaintiff alleges that, during the incident on December 6, 2016, Defendant Jensen began swearing at her. *See id.* (citing Dkt. No. 1 at ¶ 32). Plaintiff notes that in his disciplinary proceeding testimony he admitted that "I cussed once at her[.]" *See id.* No reasonable fact-finder could find that one cuss word during a tense situation would constitute "direct participation" in violating Plaintiff's constitutional rights. In fact, Jensen himself experienced the same negative treatment from Defendant Nichols, even though he was male. *See* Dkt. No. 58-1 at 25. Plaintiff admitted that she never asked Defendant Jensen to take any action against Defendant Nichols; although she contends that she complained to him, and Defendant Jensen

told her nothing could or would be done about Defendant Nichols's conduct. *See* Dkt. No. 58-1 at ¶ 40; Dkt. No. 60-1 at ¶ 40; Dkt. No. 58-7, Ex. A at 46. Even the conduct about which Plaintiff complained – that Defendant Nichols left a note on her bus telling her to park somewhere else – was not a complaint about gender discrimination. *See* Dkt. No. 58-7, Ex. A at 46. Because there is no evidence that Defendant Jensen contributed to or was aware of any discriminatory actions and only learned of gender-neutral issues between Plaintiff and Defendant Nichols, the Court finds that Defendant Jensen cannot be held individually liable under § 1983.

### b. *Municipal liability*

"Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)) (other citation omitted). However, municipal entities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). They may be sued only when a government's policy or custom, made by policymakers or officials, inflicts injury. *See id.* The *Monell* court further ruled "that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

In other words, a municipal entity like a school district cannot be held liable under § 1983 unless one of the officials or policymakers violated the Constitution. Defendant Kisloski, as Superintendent, is the only individual Defendant who is a policymaking official within Defendant District. However, as the Court noted, Plaintiff has not come forward with any evidence that Defendant District, through its policymaker, Defendant Superintendent

Kisloski, had a policy of discriminating against female bus drivers. Thus, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's § 1983 municipal liability claim against Defendant District.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for judgment on the pleadings, *see* Dkt. No. 13, is **DENIED** insofar as Defendants argue that Plaintiff has failed to exhaust her administrative remedies and the remainder of that motion is **DENIED** as moot; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 58, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED.**

Dated: March 27, 2020

Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge